Case number 20-5378, Progressive Rail Inc at all versus CSX Transportation Inc. Arguments not to exceed 15 minutes per side. Ms. Hands, you may proceed for the appellant. Good morning. Good morning, judges. For the record, I have reserved five minutes for rebuttal. Okay. Distinguished panel, this question before the court is whether CSX, a domestic rail carrier, is entitled to the protections of the Himalaya incumbent not to sue clauses in the Blue Anchor Bill of Lading. We submit the answer is decisively no. The answer depends on resolving the issue of whether the parties intended to contract for a through transport from Bremerhaven, Germany to Kent, Kentucky via Baltimore. Or instead, they intended to split the carriage between two separate contracts. In a contract case, normally we'd figure that stuff out by looking at the contract. Is that what we do here? Well, you have to look at the contract as a whole and the party's intent is determinative in this case. As reflected by the words of the contract? Well, we are usually do this, right? But in this case, Your Honor, we are introducing extrinsic evidence. Why? We only do that if it's ambiguous. But we're not interpreting an ambiguity in the contract. We are interpreting a mistake that was committed in forming that contract. As stated by Mr. McKeevy in his deposition. Mr. McKeevy is an officer with CUNANAGLE, Inc. And that was one of the intermediaries involved in this case. He stated that there was a mistake, a glaring, he actually qualified as a glaring administrative error because of the way the sales transaction was formed. Remember, the sale between- Counsel, I think one thing that would just help a little bit, I just want to, following up on Judge Ketlich's question, we'll grant you the idea that we'll talk about extrinsic evidence. That's fine. And I want you to have a chance to do that. But if you look at the blue anchor line bill of lading, that first one, is there language in that that helps you? I mean, if there's not, that's fine. We'll just go to the mistake and then the extrinsic evidence. Before we go there, I just want to see if there's some language in that bill that helps you. Well, no, your honor. The short answer is no. Okay. Stay close to the mic. Stay close to the mic. We can't hear you. I'm sorry. Is this better? A little bit. So as I was saying, the mistake issue here was because the terms of the sale were on CIF, and that's a sale between Siemens AG, that's Siemens Germany, and Siemens Energy, was on cost insurance freight Baltimore. The terms required that title and risk of loss of these transformers pass to Siemens Energy at Baltimore. That's why the parties decided to ship to Baltimore. And the other one, Siemens Energy, in its sale transaction with Gallatin Steel, the actual receiver of this transformer, required that to ship the transformers to Gallatin on the terms it's called delivered at PAD, Gantt. So they were required to deliver in Gantt. Now, one other thing that I want to mention on the extrinsic evidence, my opponent, CSX, and the district judge opened the door for the use of extrinsic evidence. The judge actually relied, in his opinion, on extrinsic evidence because the judge used an email from May 29, 2012, between Oliver Nietzschel of Siemens AG, Germany, and Marisha Hines from Siemens Energy in Orlando, to indicate that the parties intended this to be full scope with Kuhn and Nagel. Ms. Hines. So, counsel, I'm maybe losing the thread a little bit. I want to make sure I gave you a chance to use this one, the glaring administrative mistake, right? That's your, maybe your best evidence here. So is this fella who gave that evidence, was he instrumental in negotiating the contract, or was he someone who knows a lot about these contracts and just stepping back said, hey, something must have gone wrong here? What was his role? Can't hear you. Barely. How's this now? Good. Okay. He was instrumental in negotiating the overland portion of the contract, for sure, because he was the one that approached Siemens Energy. Wait, wait, wait, but that's not helpful. The overland is after the fact. I can't read that. Correct. It's after the fact, but he worked for the company in the United States, and he was alerted by his counterparts in Germany that Siemens had agreed to transfer only up to the extent of their engagement. So with that knowledge, he approached Siemens Energy in Orlando and said, my company has been awarded their contract up to Baltimore. There's one more thing to point out, your honors, is that the freight was paid up to Baltimore. The freight that was paid by Siemens Germany to Cunenegal and therefore Blue Ankle was up to Baltimore. Blue Ankle did not assume any obligations whatsoever for the overland, not to retain a carrier for the overland portion, not to conduct the carriage itself. One other important factor is that there was no obligation on Blue Ankle line. One other more relevant than anything else, and if I have to leave you with just one thing, is that Siemens Germany was presented with a quote for through transport, that May 25th quote. Siemens Germany expressly rejected that quote, and a new quote for just the ocean portion was offered and accepted. So the conduct of the parties, which is one of the multifactors in New York line case and the other lines of cases, the conduct of the parties is determinative in this case, as well as- Those cases aren't binding on this court, obviously. Well, but it would clearly have been recognized by Supreme Court precedent on other facts. The Kirby and Regal-Beloit cases involve true through shipments. That's not the case here. But they didn't apply this four-factor test that by its terms really dumps the court right into extrinsic evidence at the outset of purporting to interpret a contract. Kirby doesn't do that, right?  Doesn't matter. I mean, the court did that, but I guess my point is you might have to reckon with a straight up contractual interpretation here, rather than some four-factor test that's mostly about extrinsic evidence. Well, Your Honor, I made the extrinsic evidence- I can't hear you. Can you hear me? Barely. You've got a wild computer there. It must be my audio. I apologize. Extrinsic evidence is always admissible to prove a mistake, and that's exactly what we're doing. And like I said before, even the district judge opened the door for use of extrinsic evidence. Counsel, let me tell you what I consider an unsympathetic fact, okay? So this is an unsympathetic fact to your side. And why don't you respond by either saying, well, not so true, or give me something that's really sympathetic that helps you. What strikes me as utterly unsympathetic to your side is clearly Siemens Germany and Siemens Energy were involved in this contract. Whatever else happened, they were involved in this contract. In that contract, they gave up the right to go after people, okay? So whatever mistake happened, I just want to say, guys, look in the mirror, all right? That was your fault. So what's the answer to that? That's the part of this case that just really baffles me. Siemens, if it was a mistake, it was Siemens' mistake. And sorry, but it waives the liability. I disagree, Your Honor. It was not Siemens' mistake. It was somebody in Kuhn and Eggles of Operations, a clerical administrative department, who inserted the word Ghent. Everybody understood Ghent was not going to be- Well, no, but it was a mistake by not reading it before you agree to it. Isn't that their fault? No. Bear in mind that this way bill, the Blue Anchor Way Bill, was categorized as a house bill. And as described by Mr. McKibbin, applied only between the parties, between the shipper and the bill of lading that does not have that reference to Ghent as a price of delivery. Okay. Well, I see you'll get your full rebuttal. We'll hear from your friend on the other side. Okay. Thank you. Good morning. Good morning. Andrew Steiff on behalf of the Appalese CSX Transportation, and may it please the Court. And to address the point that Your Honor was just asking about, when you have a deal with that, the Kirby case in the Supreme Court specifically said that when there's a mistake like that alleged, the burden is borne by the intermediary. So when the shipper, Siemens, claims that its contracting party, K&N, has made a mistake, that's K&N's and Siemens' burden to bear. And Siemens takes that up with K&N and can sue them. And that was a major factor that the and there are other courts. Out of curiosity, why didn't that happen here? Or did it happen? And I just didn't realize it. I believe that there is some testimony from Siemens' second corporate representative, Mr. Krantz, that there is some resolution of a claim under a framework agreement that existed between K&N and Siemens. So that may have happened, although I don't know for how much and when. Does the record show that they had an ongoing relationship? Absolutely, yes. And the record shows that they dealt with agreements like this all the time. And so here's what strikes me as an unsympathetic fact to your side. It doesn't seem like CSX relied on this. In fact, it looks like they didn't even know about it until well into the litigation. It was just a manna from heaven. In the middle of the litigation, some clever associate actually went and read the contract. Is that what happened? No, it's a fair point to raise. Actually, we didn't know this document existed until years into the case. And in fact, Siemens didn't produce it to us in response to our discovery. We had to get it from a third-party subpoena from K&N, who was a non-party. So we didn't know about this document, as we've said in our briefs, until well into discovery. But the Kirby case and others talks about how there's no reliance necessary. The use of downstream subcontractors, rail carriers and others that don't know about these documents is exactly what happens in these cases. And in the Kirby case, that's why it was so significant for the court to point out that the downstream subcontractor, like a rail carrier, has no duty to investigate these. So counsel, I'm by no means a business or economics expert, but I would have thought all of this is just about one thing, risk and insurance. How in the world do people order their affairs in terms of insurance if they don't know they have the risk? That's bizarre. So you really have a world in which the railroad doesn't know whether to get insurance for the shipment because they don't know if it's a through bill? That seems crazy. Well, your honor, that's simply the nature of it. The entire point of the Kirby and Regal decisions is to make these through shipments predictable. And it's the predictability is through the parties that are arranging it. Siemens and K&N are as the contracting parties, the various entities and subsidiaries, all of whom are on the face of this document, know what arrangement they want. And that's what they contracted for. And in fact, in the Regal case, the court talked about what factors were significant in removing the liability of the downstream subcontractor. And it's the very factors you're talking about. The fact that the cargo owner, Siemens, for here had separate insurance, which they did, and they got paid by their insurance company. The fact that the cargo owner doesn't contract directly with the downstream carriers. That is the whole reason that why a through bill exists is because there is no privity here. And that was true there. And sophisticated. CSX, did CSX have insurance for that, for its leg of the journey? CSX did not have insurance for the, for this leg of the journey. No. Why not? I would, it's not a, not a normal practice. As far as I know, your honor, I don't, I don't know that it's come up, come up in this case. You know, in terms of, of what we, what we heard from for there's that you've not heard anything about this document being ambiguous. In fact, there's a concession that it is unambiguous. There is no, you've heard an argument about a mistake being made. Kirby rejects that type of argument and Royal SMIT, the fifth circuit case is directly on point where a party makes an argument that they have a contract that was never meant to be enforced. This is a simple issue of contract interpretation. As the Kirby case said, they, they are talking about extrinsic evidence that are used by the party to the contract to undermine their own contract. And that argument frankly, has been rejected by every court that has addressed it. The Kirby case, the Royal SMIT case, the Calchem case, you treat bills of lading like any other contract and you don't supersede them with evidence that, that is extrinsic. And I want to talk a little bit about what, what the reference to the Mr. McKeeby's testimony, because I think that was significant to the argument. Mr. McKeeby disclaimed any knowledge of the arrangement of the shipment before the inland aspect. There was no opening of the door by the way. And in fact, his counsel objected at the beginning of that deposition to any testimony on that topic. And if you read the was a mistake. And so if you think about the Kirby and Regal opinions, what, what are they really about? And this case is this court's opinion in the Royal insurance case. They're critical a bit here because in those cases, the court simplified and made uniform a previously confusing set of laws. You discard complex inquiries and the intent is to make intermodal shipments like this predictable and reliable to, to favor them. And that's why, since those cases were decided, there is not one single case from any court. And certainly none that Siemens has pointed out in which a court refused to enforce a through bill that on its face applies to the whole, the whole shipment. And that's exactly what you have here. An unambiguous contract. It says only fill in the blank if it's an intermodal shipment and they filled it in. And if that's K&N's mistake, Siemens should take that up with K&N. Siemens energy and AG are both defined in that document as merchant. And they unequivocally agreed in the, in the terms of that document that the merchant will not assert claims against downstream contractors. And yet that's exactly what they did in this case. It's a completely uncomplicated issue that, that should be resolved just based on a look at the contract itself, which involves every party that was every argument that you hear and have heard from Siemens is extrinsic evidence to undermine its own contract. And that's illogical. You don't, you don't need Supreme court precedent to know that you can't modify the terms or render them ambiguous with prior outside discussions. That the bill of lading supersedes that. And if they were allowed to do what Siemens claims they can do here, they would undermine not only the thrush, the through bill scheme that the Supreme court has set up, they'd undermine contracts generally. They'd carve out. I have one discreet question. And after that, I'm not sure we'll need to hear that much more and, but I'll give judge Norris and judge Ketledge a chance. Just want to make sure I understand one thing correctly. So there's this domestic statute, American statute that prohibits someone like CSX from disclaiming liability. So one oddity of the outcome you're proposing is you, you, you, you, you get the very thing. The statute prohibits is the answer as simple as, well, the statute only applies when it's a contract just for overland domestic travel. The statute doesn't prohibit through bills is so that's what I take to be the rule, but I'm just not sure I'm right about that. That is correct. Your honor Congress passed the carriage of goods by sea act. And then the, and the Supreme court has talked about how, what the interplay is between those statutes. And this court, in fact, in the Hyundai merchant case said that COGSA applies, not Carmack, where you're part, you have a validly written covenant, not to sue and a Him, a Himalaya clause. And there's also a clause that extends the coverage of COGSA, even while it's in the United States. And when you have those COGSA applies to the exclusion of Carmack. And then that loop was closed essentially in the Regal Beloit case, where they talk about the reasoning behind COGSA. And because a domestic carrier in the United States is only required to issue a bill of lading where it's the first carrier in the, in the line here as part of a through shipment, they're merely a connecting carrier, not, not the originating or, or receiving carrier. They don't have to issue a bill of lading because they're merely one carrier in the middle of an international shipment to the, to your honor's I'm happy to answer any other questions. Let me see if judge Norris or judge Kethledge have any other questions. Nope. Okay. I think, I think we appreciate your argument. Thank you so much. Thank you for answering our questions and thank you for the brief council. You have your rebuttal time. Can't hear you. You got to put your mute. There you go. Excuse me, but this ain't no way to run the railroad. That's funny. That's a good one, Al. You have to speak up. Speak up. I can't hear a word. Hear me now? Yes. Only when you're really close. You got to be really close. All right. CSX, as I understand from either the testimony or the submission in this case, it's self-insured. So just to answer that question that your honor's had, one thing that I do want to bring up is we cannot forget the June 12, 2012 quote that was just for the ocean carriage. That is determinative in this case, that together with the acceptance by Siemens AG, that together with the new quote presented by Kuhn and Nagel, Inc. to Siemens Energy, that together with the fact that Siemens Energy went out to another entity, another freight forwarder, HLI. So council, just to give you a chance to, I want you to respond to the thought I have about that. If you have a through bill of lading that refers to subcontracts, it seems very strange to say the subcontracts prove that it was a through bill of lading. That doesn't make sense to me. You're allowed to have a through bill which contemplates subcontracting to a railroad or to a ship. CSX was not a subcontractor of Blue Anchor Line. CSX has admitted that they didn't even know this bill of lading existed. CSX has admitted in deposition and also in their affidavit that submitted in support for the motion to summary judgment, that they had no dealings whatsoever, no interactions with Blue Anchor Line or K-Line. But the Blue Anchor contract refers to subcontractors that can be rail carriers. In general terms, when you are dealing with a true through shipment, but that was not the case here. If it wasn't because of that mistake, everybody understood, everybody knew this was not a through shipment. Siemens Energy rejected that offer. Siemens, Kuhn & Nagel Germany understood of that rejection and also offered a separate quote which created a separate contract for the overland portion only. These two were two distinct contracts subject to different terms and conditions. Each was subject to a different term condition. And the freight closes the deal, your honors. The freight proves that Blue Anchor Line was not engaged to conduct any portion of the overland move. CSX admitted that they got paid through Progressive. Progressive got paid by Kuhn & Nagel Inc. Kuhn & Nagel Inc. got paid by what's going on between Siemens and K&L. Can't Siemens get relief from K&L? They made a mistake and that's what, it's in your power to correct that mistake because the conduct of the party. K&L made a mistake, right? K&N, correct. K&N, forgive me. So then Siemens goes after K&N, they get their $1.5 million, all's good, your client's happy. I don't think it's that simple, your honor. There's time issues that may preclude us from doing that and there's no need because the contract was not a through the company that damaged this transformers, not K&N. Ms. Hands, in the time we have left, I'd like to offer you some well-intentioned advice and it pertains to the manner in which the Siemens briefing treats the district court. And in the opening brief, for example, the brief says that the district court studiously ignored relevant facts, that the district court's decision was unadulterated legal heresy, that the district court emasculated some rule, and that it fabricated other rules. And this, again, it's well-intentioned, but I do want to tell you that that kind of invective directed at a district judge who is by all appearances doing his task here entirely in good faith or directed against opposing counsel really does your cause no favors. It's apart from the merits, but I think given some of the language here, I wanted to say that and you don't have to respond, but I don't want it to go in our brief offender report. Very good. Okay, the case will be submitted. Thank you for answering our questions today and we'll hear the next case. Thank you. Thank you.